LAKE MICHIGAN COLLEGE FEDER-
ATION OF TEACHERS and Edwards
Shaffer, individually and all others
similarly situated, Plaintiffs-Appellees,

v.

LAKE MICHIGAN COMMUNITY
COLLEGE, Defendant,

v.

Frank J. KELLEY, Attorney General of
Michigan,
Defendant-Intervenor-Appellant.

LAKE MICHIGAN COLLEGE FEDER-
ATION OF TEACHERS and Edward
Shaffer, individually and all others
similarly situated, Plaintiffs-Appellees,

v.

LAKE MICHIGAN COMMUNITY
COLLEGE, Defendant-Appellant,

v.

Frank J. KELLEY, Attorney General of
Michigan, Defendant-Intervenor.

Nos. 74–2323, 74–2324.

United States Court of Appeals,
Sixth Circuit.

July 2, 1975.

Robert A. Derengoski, Frank J. Kelley, Atty. Gen., George L. McCargar, Jr., Gerald F. Young, Lansing, Mich., John A. Relias, Robert C. Claus, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for appellant in No. 74–2324.

Bernard J. Fieger, Craig, Fieger & Golden, Southfield, Mich., for appellees.

John A. Relias, Paul F. Gleeson, Robert C. Claus, Vedder, Price, Kaufman & Kammholz, Chicago, Ill., Frank J. Kelley, Atty. Gen., Lansing, Mich., Spelman, Taglia, Meek & Lagoni, Paul A. Taglia, St. Joseph, Mich., for appellant in No. 74–2323.

Before PHILLIPS, Chief Judge, MILLER, Circuit Judge, and CECIL, Senior Circuit Judge.

PHILLIPS, Chief Judge.

This appeal presents the recurring problem of due process rights of discharged teachers under *Board of Regents* v. *Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and *Perry* v. *Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The teachers here were employed by the Lake Michigan Community College (College), a public educational institution, and they were discharged in accordance with Michigan's Public Employment Relations Act (PERA), Mich.Stat.Ann. § 17.455(1) *et seq.,* M.C.L.A. § 423.201 et seq., for participating in an illegal strike. In an opinion reported at 390 F.Supp. 103 (W.D.Mich.1974), the District Court concluded that the PERA termination procedures would not provide the teachers with due process, and it granted remedial relief against the College. We hold that in the circumstances of this case the striking teachers do not enjoy the protection of the due process clause and

that, even if they do, the District Court incorrectly found the PERA procedurally deficient. Accordingly, we reverse and remand for dismissal of the complaint.

The Lake Michigan College Federation of Teachers (Union) is the collective bargaining representative of the College's faculty. The parties' most recent collective agreement was scheduled to expire in August 1972, and bargaining for a new contract began in February of that year. By early August 1972, most major issues had been resolved except faculty salaries. The Union demanded a 5.5% increase, and the College sought to avoid any increase for the 1972–1973 school year. At the request of the College, the Michigan Employment Relations Commission (MERC) appointed a mediator pursuant to the PERA. Mich.Stat.Ann. § 17.455(7), M.C.L.A. § 423.207. The parties met with the mediator, but no agreement was reached. The collective agreement expired on August 12, 1972, and the faculty returned to work in the fall under a "day-to-day understanding" between the College and the Union. The precise terms and general effect of this understanding are not entirely clear. Apparently it implemented the new contract terms to which the parties already had agreed and carried over some of the provisions of the expired agreement. The District Court found that the day-to-day understanding contained an agreement by the faculty and the Union not to strike.

At the Union's request, MERC subsequently appointed a fact-finder, whose conclusions and recommendations are not binding on the parties. *See* Mich.Stat. Ann. § 17.454(27), M.C.L.A. § 423.25. The fact-finder held hearings and on January 11, 1972, issued a report recommending acceptance of the Union's proposals. The College rejected the fact-finder's suggestions, and negotiations continued between the parties. In early February 1973, the College and the Union agreed on a one-year contract that did not include a general increase in salary levels. The faculty voted to reject this agreement. The College made further proposals that the Union found unacceptable, and on February 14, 1973, the Union filed unfair labor practice charges with MERC, alleging that the College had breached its duty under the PERA "to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." Mich. Stat.Ann. § 17.455(15), M.C.L.A. § 423.-215. The administrative law judge subsequently found in favor of the College and recommended that the Union's charges be dismissed. On appeal MERC agreed, concluding that the College "engaged in no more than hard bargaining and did not violate its duty to bargain in good faith . . . ." The Michigan Court of Appeals eventually affirmed MERC's decision. *Lake Michigan Federation of Teachers* v. *Lake Michigan College*, 231 N.W.2d 538 (Mich.App.1975).

On February 15, 1973, almost all of the faculty went on strike. The College made several appeals to the striking teachers to return to work, but most remained on strike. On February 27, 1973, the College notified all striking faculty members that their concerted action was illegal[1] and that if they did not return to work by March 5, 1973, their employment would be terminated in accordance with § 6 of the PERA, Mich.Stat.Ann. §. 17.455(6), M.C.L.A. § 423, 206.[2] On

---

1. Under the PERA, public employees are forbidden to strike. Mich.Stat.Ann. § 17.455(2), M.C.L.A. § 423.202. At the time this case arose, the word "strike" was defined as follows:

 As used in this act the word "strike" shall mean the concerted failure to report for duty, the wilful absence from one's position, the stoppage of work, or the abstinence in whole or in part from the full, faithful and proper performance of the duties of employment, for the purpose of inducing, influencing or coercing a change in the conditions, or compensation, or the rights, privileges or obligations of employment.

 Mich.Stat.Ann. § 17.455(1), M.C.L.A. § 423.-201.

2. Mich.Stat.Ann. § 17.455(6), M.C.L.A. § 423.-206 provides as follows:

March 5, 1973, the College terminated` the day-to-day understanding with the Union on the ground that the Union had breached the no-strike provision of the agreement. On March 6, 1973, the College notified the striking teachers of their termination and informed them that under § 6 of the PERA they could request a hearing to determine whether their conduct in fact violated the PERA. Many of the discharged teachers requested hearings, which were scheduled to begin in early April 1973 before three members of the College Board of Trustees. This litigation intervened, however, and none of the hearings has been held.

On April 6, 1973, the Union and the discharged teachers commenced this action in the District Court against the College. The complaint alleged that the striking teachers had been terminated in violation of the due process clause, and it sought reinstatement until such time as the College devised a termination procedure consistent with due process. The District Court conducted a hearing, and on April 30, 1973, it entered an order requiring immediate reinstatement of the plaintiffs and forbidding the College to hold termination hearings pursuant to the PERA. Shortly thereafter, this court granted a stay pending appeal and eventually vacated the District Court's order as an abuse of discretion. *Lake Michigan College Federation of Teachers* v. *Lake Michigan Community College*, 480 F.2d 927 (6th Cir. 1973).

The case proceeded to trial on the merits, and on September 27, 1974, the District Court issued an exhaustive opinion and an order granting injunctive relief to the plaintiffs. 390 F.Supp. 103. In essence, the court held that the discharge of the striking faculty was subject to the requirements of the due process clause because the teachers enjoyed a protected property interest in their employment and because the terminations adversely affected the teachers' liberty as that term is used in the fourteenth amendment. The court further concluded that the hearing procedure established by the PERA was deficient in this case because the Board of Trustees was actually biased against the striking faculty and therefore could not render a decision with the impartiality required by the due process clause. Accordingly, the District Court ordered the College to commence a declaratory judgment action in the appropriate Michigan Circuit Court to determine whether the discharged teachers in fact were on strike illegally within the meaning of the PERA. The College now appeals from the order of the District Court.

■ The safeguards of procedural due process apply only when a person is deprived of liberty or property, and plaintiffs cannot prevail here unless their discharge implicated one of these protected interests. In *Board of Regents* v. *Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court set forth

Notwithstanding the provisions of any other law, any person holding such a position who, by concerted action with others, and without the lawful approval of his superior, willfully absents himself from his position, or abstains in whole or in part from the full, faithful and proper performance of his duties for the purpose of inducing, influencing or coercing a change in the conditions or compensation, or the rights, privileges or obligations of employment shall be deemed to be on strike but the person, upon request, shall be entitled to a determination as to whether he did violate the provisions of this act. The request shall be filed in writing, with the officer or body having power to remove or discipline such employee, within 10 days after regular compensation of such employee has ceased or other discipline has been imposed. In the event of such request the officer or body shall within 10 days commence a proceeding for the determination of whether the provisions of this act have been violated by the public employee, in accordance with the law and regulations appropriate to a proceeding to remove the public employee. The proceedings shall be undertaken without unnecessary delay. The decision of the proceeding shall be made within 10 days. If the employee involved is held to have violated this law and his employment terminated or other discipline imposed, he shall have the right of review to the circuit court having jurisdiction of the parties, within 30 days from such decision, for determination whether such decision is supported by competent, material and substantial evidence on the whole record.

guidelines for determining when an employee has a property interest in continued public employment:

> Certain attributes of "property" interests protected by procedural due process emerge from these decisions. To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.
>
> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.
>
> 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d at 561.

In the case at hand, the District Court examined *Roth* and its progeny and reached the following conclusion:

> All the plaintiffs in this case thus have property interests cognizable by the Due Process Clause. Any individual who is a "public employee" by statutory definition plainly has a cognizable property interest when an alleged violation of a substantive prohibition of the statute is sought to be redressed by a statutorily-authorized deprivation of the interest through discharge for cause.[64]

64. This is to say only that procedural due process limitations apply to the state's enforcement of the substantive prohibitions of PERA. In the ordinary course of a school's administration where the focus is on individual teachers and there is no serious labor dispute, individual contracts and terms of employment remain significant in determining the existence or absence of a cognizable property interest. Roth, supra; Sindermann, supra.

390 F.Supp. at 130–31 & n. 64.

■ We disagree. The fact that the PERA authorizes termination of public employees who strike does not give rise to "a legitimate claim of entitlement" to continued employment within the meaning of *Roth*. Nor does a striking teacher's claim to public employment rise to the level of a protected property interest merely because the PERA requires the employer to follow certain procedures when discharging the employee. *See Ring* v. *Schlesinger*, 502 F.2d 479, 487 (D.C.Cir. 1974); *Suckle* v. *Madison General Hospital*, 499 F.2d 1364, 1366 (7th Cir. 1974). If the PERA instills any expectation in public employees, it is that they will be terminated or otherwise disciplined according to specified procedures if they go on strike. The present case is fundamentally different from cases such as *Indiana State Employees Association* v. *Boehning*, 511 F.2d 834 (7th Cir. 1975), and *Young* v. *United States*, 498 F.2d 1211 (5th Cir. 1974), which involved comprehensive statutes or regulations that specifically delineated the grounds upon which certain public employees could be discharged. By contrast, the PERA contains no comprehensive catalogue of the substantive grounds for discharge, and it gives no assurances, conditional or otherwise, of continued public employment.

■ The distinction we draw here is supported by the Supreme Court's recent decision in *Arnett* v. *Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). There the relevant statute provided that certain public employees could be discharged "only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7501. Although there was no opinion of the Court in *Arnett*, a majority of the Justices agreed that the statute conferred upon the employees a legitimate claim of entitlement to continued employment that amounted to a property interest cognizable under the due process clause. The cornerstone of the decision in *Arnett* was the Government's statutory promise to its employees that they would retain their jobs in the ab-

sence of a specified cause for discharge. In the case at bar, however, the PERA contains no such promise. We are convinced that this statute does not give rise to a protected property interest in continued employment.

■ The Union and the faculty argue that entirely apart from the PERA a fourteenth amendment property interest was created by Article X of the collective bargaining agreement, which deals generally with job security. The District Court did not rely upon this rationale, and we find it unconvincing. The collective agreement expired on August 12, 1972, and Article X could have subsisted only in the subsequent day-to-day understanding between the parties. However, before the teachers had been finally discharged, this understanding was terminated by the College in response to the strike, which was itself a substantial breach of the understanding. Once the understanding had been terminated, the teachers were left, as the District Court noted, with "no collective bargaining agreement, no collective understanding, and no signed, written, individual teachers' contracts in hand." 390 F.Supp. at 118 n. 34. We conclude that neither the bargaining agreement nor the later informal understanding conferred upon the faculty members in this case a due process property interest in continued public employment.

■ The requirements of procedural due process also apply to the deprivation of a protected liberty interest, and again we turn to *Board of Regents* v. *Roth* for guidance:

> There might be cases in which a State refused to reemploy a person under such circumstances that interests in liberty would be implicated. But this is not such a case.

> The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of

dishonesty, or immorality. Had it done so, this would be a different case. For "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Wisconsin* v. *Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515. *Wieman* v. *Updegraff,* 344 U.S. 183, 191, 73 S.Ct. 215, 219, 97 L.Ed. 216; *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817; *United States* v. *Lovett,* 328 U.S. 303, 316–317, 66 S.Ct. 1073, 1079 [106 Ct.Cl. 856], 90 L.Ed. 1252; *Peters* v. *Hobby,* 349 U.S. 331, 352, 75 S.Ct. 790, 801, 99 L.Ed. 1129 (Douglas, J., concurring). See *Cafeteria Workers* v. *McElroy,* 367 U.S. 886, 898, 81 S.Ct. 1743, 1750, 6 L.Ed.2d 1230. In such a case, due process would accord an opportunity to refute the charge before University officials. In the present case, however, there is no suggestion whatever that the respondent's "good name, reputation, honor, or integrity" is at stake.

> Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities. The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities.

408 U.S. at 573, 92 S.Ct. at 2707, 33 L.Ed.2d at 558.

Thus it appears that due process safeguards would apply if the discharge of a teacher foreclosed future employment opportunities that otherwise would be open to him or if the grounds for the discharge tend to discredit the teacher's honesty or integrity or to damage his standing in the community. The federal courts have had many opportunities to refine and to apply the general guidelines set forth in *Roth*. For example, liberty interests are not implicated when a teacher is charged with failure to meet

minimum standards in his professional relationship with students. *Blair* v. *Board of Regents,* 496 F.2d 322 (6th Cir. 1974). Similarly, allegations of improper or inadequate performance do not constitute a deprivation of liberty within the meaning of the fourteenth amendment. *Abeyta* v. *Town of Taos,* 499 F.2d 323 (10th Cir. 1974); *Shirck* v. *Thomas,* 486 F.2d 691 (7th Cir. 1973). It has been held that in certain circumstances even the charge of "incompetence, neglect of duty and malfeasance in office" does not amount to a deprivation of liberty under *Roth. Adams* v. *Walker,* 492 F.2d 1003, 1008–09 (7th Cir. 1974).

On the other hand, this court has held that labeling an unconvicted person as an active shoplifter does infringe upon a protected interest in liberty. *Davis* v. *Paul,* 505 F.2d 1180 (6th Cir. 1974), *cert. granted,* 421 U.S. 909, 95 S.Ct. 1556, 43 L.Ed.2d 773 (1975). In addition, charges of mental illness, fraud, and untruthfulness all have been held to affect the discharged employee's liberty. *Lombard* v. *Board of Education,* 502 F.2d 631, 637–38, (2d Cir. 1974), *cert. denied,* 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975); *Huntley* v. *Board of Education,* 493 F.2d 1016, 1019 (4th Cir. 1974); *Hostrop* v. *Board of Junior College Dist. No. 515,* 471 F.2d 488, 494 (7th Cir. 1972), *cert. denied,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973).

Against this background, the District Court in the case at bar held that protected interests in liberty were infringed when plaintiffs were discharged for violating the state statute prohibiting strikes. The court explained its conclusion as follows:

It is clear in this case that the teachers' liberty interests are strongly implicated. The teachers are accused of breaking state law, and Lake Michigan College has already imposed the maximum penalty allowed by law, forfeiture of their jobs. In a society which values law and order, a finding by a state agency that a person has broken the law is *per se* an infringement of the person's interests in his "good name, reputation, honor, or integrity," and is in itself a stigma which strongly tends to foreclose his freedom to take advantage of other employment opportunities, at least where the finding is widely publicized and is coupled with the imposition of a severe statutorily authorized penalty. 390 F.Supp. at 131.

We believe that the District Court erred in announcing a sweeping rule to the effect that whenever a person is accused of breaking a law, his fourteenth amendment liberty interests are implicated automatically. Some laws undoubtedly proscribe conduct that bears upon the honor, integrity, and reputation of those who engage in it. However, there are many laws, such as traffic regulations, that do not fit this description. Each case must be decided upon its own facts.

In the case at hand, the teachers were accused of violating Michigan's no-strike law, and we fail to see how this allegation discredited their honesty, morality, and integrity or damaged their standing in the community. The PERA provides no criminal penalties for illegal strikes. Furthermore, through their pickets and placards the teachers openly announced the fact that they were on strike. Apparently they did not believe that their conduct was dishonest or immoral or that it would seriously damage their reputation in the community. At trial three of the teachers testified that there was no hostile community reaction to their participation in the strike. Similarly, we see nothing in this record to indicate that by discharging the striking faculty, the College foreclosed other employment opportunities that were available to them. The College favorably recommended several of the discharged teachers to prospective employers and generally assisted the teachers in their search for employment elsewhere. Many of the faculty members did succeed in obtaining other jobs, some of which were teaching positions. To be sure, plaintiffs lost their positions at the College, which may have made them less attractive to other employers, but in and of itself this

does not amount to a deprivation of liberty. *Board of Regents* v. *Roth*, 408 U.S. 564, 574 n. 13, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Plaintiffs have made no showing that a definite range of opportunities is no longer open to them, and accordingly their liberty has not been restricted within the meaning of *Roth.*

Although the foregoing discussion disposes of this case, we believe that there is a substantial alternative basis for the result we reach here. Even if it is assumed that the requirements of procedural due process were applicable in the circumstances of this case, we cannot agree that the termination hearings to be held by the Board of Trustees would fail to meet minimum constitutional standards.

 In concluding that these hearings would be procedurally deficient, the District Court focused on the need for an impartial decision maker:

In this case, very serious factual issues are to be resolved by the administrative tribunal. The teachers are accused of breaking the law, and the tribunal must determine whether each teacher engaged in a work stoppage in concert with others "for the purpose of inducing, influencing or coercing a change in the conditions or compensation, or the rights, privileges or obligations of employment." M.C.L.A. Sec. 423.206. The legal position of the unfair labor practice strike in P.E.R.A. is also implicated. Clearly, considering the importance of the deprivations involved and the nature of the issues to be decided, the teachers are entitled to an *impartial decision maker.* 390 F.Supp. at 132.

Earlier in its opinion, the court found that the College hoped to "break" the Union and that the Board's intransigence on the issue of salaries was "so provocative that it must be characterized as being violent, if not barbaric." 390 F.Supp. at 109. Accordingly, the court had little difficulty in concluding that the Board of Trustees was actually biased against the striking teachers and

was "utterly incapable of rendering a fair and objective judgment on the difficult factual and legal questions of whether the teachers violated the provisions of P.E.R.A." 390 F.Supp. at 134. The District Court evidently based its finding of bias at least in part upon the nature and complexity of the issues that the Board would be required to decide. The court was particularly concerned with the status of the unfair labor practice strike under the law of Michigan. The PERA could be interpreted as prohibiting only economic strikes, not work stoppages in protest of an unfair labor practice committed by the employer. Thus the Board of Trustees, in performing its duty to determine whether the teachers in fact had violated the PERA, would have to decide in which type of strike the teachers had engaged. This would put the Board in the anomalous position of deciding whether the College had committed an unfair labor practice, with the teachers' jobs hanging in the balance. Given the animosities that often accompany labor disputes and this interpretation of the PERA, it is not surprising that the District Court wished to find another forum for the termination hearings.

However, after the District Court's decision in this case the Michigan Supreme Court issued its opinion in *Rockwell* v. *Crestwood School District Board of Education*, 393 Mich. 616, 227 N.W.2d 736 (1975), which substantially undercuts the District Court's conclusion on the bias issue. *Rockwell* makes it clear that a strike by public employees is illegal even though the employer has committed unfair labor practices. *Id.* at 639, 227 N.W.2d at 746. More important, the case defines the nature and scope of a PERA termination hearing:

A Section 6 hearing is of limited inquiry. Its sole purpose is to determine whether the employer correctly identified the particular employee as a violator of the act's prohibition against striking. Since the hearing will ordinarily be conducted by the employer, as the officer or body having general

disciplinary authority, a Section 6 hearing is not an appropriate forum for the employee to assert in defense the employer's violation of the act. Allegations of or defenses premised upon employer misconduct are the exclusive province of the MERC to resolve upon the filing of an unfair labor practice charge.

Even if it should be determined in Section 6 hearings that particular teachers have violated the provisions of the PERA by striking and those determinations are sustained on review, if MERC orders reinstatement of striking teachers because it determines that this affirmative action will best "effectuate the policies of this act" and that determination is sustained on review, the teachers shall be reinstated.

*Id.* at 640–41, 227 N.W.2d at 747.

Thus there will be no difficult factual or legal questions for the Board of Trustees to decide. The only issue will be one of fact—whether a particular employee in fact participated in the strike. The Board's sole objective in conducting the PERA hearings is to ensure that innocent teachers were not mistakenly identified as strikers, and there is nothing in the record to indicate that the Board will not perform this duty fairly. It is significant that both MERC and the Michigan Court of Appeals found that the College had not bargained in bad faith and was not guilty of any unfair labor practice. Moreover, even if the Board members were hostile toward the Union and the striking faculty, this animosity would hardly manifest itself in the form of an unfair decision against a teacher who did not participate in the strike. In view of *Rockwell*, the District Court's finding of bias cannot stand. Further, the statute (see n. 2) provides for a judicial review in the State Circuit Court from an adverse decision following a § 6 hearing.

The judgment of the District Court is reversed, and the case is remanded for dismissal of the complaint.

Costs are taxed against the Lake Michigan College Federation of Teachers.